UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    Plaintiff,

             Case No. 22-cr-251-pp

  v.

DETTRICK L. BROWN,

    Defendant.

---

**ORDER OVERRULING DEFENDANT'S OBJECTION (DKT. NO. 51), ADOPTING MAGISTRATE JUDGE JOSEPH'S REPORT AND RECOMMENDATION (DKT. NO. 50) AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 24)**

---

On June 22, 2022, officers forced entry into the upper unit of a duplex at 4108 N. 13th Street in Milwaukee to execute an arrest warrant. The defendant filed a motion to suppress, challenging the arrest, the protective sweep and a subsequent search of the unit; the defendant also moved for an evidentiary hearing. Dkt. No. 24. Magistrate Judge Nancy Joseph heard testimony and issued a report recommending that this district court deny the motion to suppress. Dkt. No. 50. The defendant has objected to the recommendation, clarifying the "context" surrounding the facts and challenging Judge Joseph's legal conclusions. Dkt. No. 51. Because the court agrees with Judge Joseph that officers had probable cause to believe that the defendant was in the upper unit of the duplex at the time they forced entry, the Fourth Amendment authorized the officers to enter the unit to execute the warrant. The court finds

that the officers did not exceed the scope of the protective sweep and that the subsequent application for a search warrant was supported by probable cause and the good faith exception. The court will adopt the recommendation and deny the motion to suppress.

## I.    Proceedings Before Magistrate Judge Joseph

###   A.    Defendant's Motion to Suppress and Motion for Evidentiary Hearing (Dkt. No. 24)

The defendant begins with the factual background. An anonymous citizen told Officer Ayala that the defendant was wanted, armed and staying in the area of 13th Street and Fiebrantz Avenue in Milwaukee. Dkt. No. 24 at 2. Ayala confirmed that the defendant had outstanding warrants. Id. at 3. After obtaining approval for a pen register and trap and trace search warrant for the phone linked to the defendant (414-676-5813), Officer Randazzo traced the defendant's phone to the address of 4108 N. 13th Street. Id. at 2.

On June 22, 2022, Ayala and eleven officers went to 4108 N. 13th St. Id. at 3. They knocked for nearly forty minutes before using a battering ram to enter. Id. The officers immediately placed the defendant in handcuffs and conducted a protective sweep during which Officer Cline opened the bedroom closet door and observed a drum magazine for a .40 caliber pistol. Id. at 3-4. The officers froze the scene and applied for a search warrant based on (1) a shooting that had occurred on April 13, 2022 at 2707 N. 54th Street in Milwaukee and allegedly involved the defendant; (2) CCAP entries that revealed numerous warrants for the defendant; (3) the fact that the defendant had a

2

probation violation and (4) Cline's recovery of the drum magazine for the .40 caliber pistol from the bedroom closet of the upper unit one hour earlier. <u>Id.</u>

The defendant raises four legal issues. First, he argues that the officers did not have reason to believe that the defendant was in the residence before breaching the door. <u>Id.</u> at 6. Second, he argues that Cline's search of the floor of the closet exceeded the scope of a protective sweep because the officers already had made the arrest and there was no reason to believe there was anyone else in the unit. <u>Id.</u> at 8. Third, the defendant says that the application for the search warrant lacked probable cause without the reference to the drum magazine found during the protective sweep. <u>Id.</u> at 9. Fourth, the defendant argues that the failure to return the pen register/trap and trace warrant made any information derived from the warrant illegal and that the government never identified the handheld device used to conclude that the defendant's cell phone was pinging from the upper unit. <u>Id.</u> at 10.

B.    <u>Government's Response</u> (Dkt. No. 26)

The government objected to the defendant's request for an evidentiary hearing on the ground that the defendant had failed to identify a disputed material fact. Dkt. No. 26 at 1. The government argued that law enforcement had probable cause because they received information from an anonymous source that the defendant was wanted, lived in the area of 13th and Fiebrantz and used the cellular telephone number 414-676-5813. <u>Id.</u> at 2. The anonymous source said that within the last two weeks, they had communicated with the defendant using that number. <u>Id.</u> Using the law

3

enforcement database, Officer Ayala confirmed that the defendant's profile was linked to that phone number and confirmed that the defendant had an outstanding warrant. Id. at 1-2. The government said that Ayala requested a pen and trap on the phone number and that Officer Randazzo later determined the phone was pinging from a location at 4108 N. 13th Street. Id. at 2. On June 22, 2022, Milwaukee police officers arrived at the N. 13th Street address and Officer Cline knocked on the door to the upper unit and repeatedly asked the defendant to come out. After approximately 27 minutes, the defendant responded to Cline. Id.

The government stated that the defendant didn't assert a factual basis suggesting that the protective sweep was improper and maintained that the sweep was justified. Id.

The government further argued that the application for the search warrant was supported by probable cause. Id. The government explained that the records of the pen and trap and handheld device were not produced because neither T-Mobile nor the Milwaukee Police Department had retained the records associated with the pen and trap, which was requested in state court. Id. Regarding the defendant's argument that the search warrant for the pen and trap was illegal based on the failure to make the return, the government says that the defendant stated no authority supporting that argument, but that regardless, the failure to return the warrant is a "ministerial duty which [does] not affect the validity of the search absent

4

prejudice to the defendant." Id. (citing Avery v. Wiegert, Case No. 12-CV-52, 2012 WL 4760792, *6 (E.D. Wis. Oct. 5, 2012)).

C.    Defendant's Reply (Dkt. No. 49)

The defense replied that the factual issues had to be resolved in a hearing. Dkt. No. 49.

D.    Evidentiary Hearing (Dkt. Nos. 44, 45)

Judge Joseph conducted an evidentiary hearing on September 7 and 18, 2023. In advance of the hearing, the parties reached a stipulation regarding the call Officer Ayala received from the anonymous citizen on May 24, 2022, in which the citizen advised Ayala that they knew the defendant, knew the defendant was wanted, knew his phone number, knew where he was living and knew that he was dangerous and in possession of a firearm. Dkt. No. 32 at ¶1. The parties agreed that after the citizen's call, Ayala checked the MPD Tri-Tech reporting system and confirmed that the defendant had the phone number 414-676-5813 listed to his profile numerous times (and as recently as March 4, 2022). Id. at ¶2. The parties also stipulated regarding Ayala's wanted check and criminal history check of the defendant and his confirmation that defendant had existing warrants and was a convicted felon, id. at ¶3, the date and time of the execution of the arrest warrant, id. at ¶4, Cline's conversation with the resident in the lower unit, id. at ¶5, Cline's actions to clear the basement, id. at ¶6, Cline and Officer Dewitt's efforts to get the defendant to come out of the unit and Cline's body cam evidence regarding the arrest, id. at ¶8, Officer Elm's body cam evidence regarding discussions with the resident of

5

the lower unit, id. at ¶9, the fact that entry was forced forty-four minutes after officers approached the door, id. at ¶10, Cline and other officers' sweep of the unit Cline finding the magazine drum on the closet floor, id. at ¶11, Officer Lastrilla's body cam footage of the protective sweep, id. at ¶12, and Ayala's body cam footage of his interaction with the defendant following his arrest, id. at ¶13. The parties agreed to the introduction of the body cam footage. Id. at ¶14.

On the first day of the evidentiary hearing, Officer Randazzo testified, explaining that he had been employed by the City of Milwaukee for almost seventeen years, that he was assigned to the fugitive apprehension unit and that his primary role was tracking cell phones. Dkt. No. 44 at 8, lines 7-24. Randazzo testified that the warrant authorized a pen register trap and trace on the target number, historical call detail records, subscriber information, historical location records and the ability to track the cellular device. Id. at 11, lines 19-24. Using the historical and real-time data location, Randazzo determined that the target number was frequently located in the area of 13th Street and Fiebrantz. Id. at 16, line 7 through 26, line 25. Randazzo testified that Ayala had provided him with the tip from an anonymous citizen that the defendant would be in the area of 13th and Fiebrantz. Id. at 27 lines 1-9.

Randazzo testified that on June 22, 2022, he used a cell site simulator to narrow the cell phone signal to the building at 4108 North 13th Street. Id. at 29, line 5 through 34, line 15. Randazzo testified that after officers were called in, he saw them make contact with someone from the lower unit and heard

them say over the radio that they would be going in the upper unit. Id. at 36, lines 24-25; 37, lines 1-23. Randazzo was made aware that officers had observed the drum magazine and that Officer Ayala had applied for a search warrant. Id. at 38, lines 2-12. Randazzo was part of the subsequent search and recovered items from the northwest bedroom, including two drum magazines filled with approximately fifty rounds of ammunition each, a ghost gun (a gun that's not traceable) and a red Apple iPhone. Id. at 39, lines 5-24.

On cross-examination, Randazzo admitted that prior to the arrest, he was not aware of any surveillance of 4108 North 13th Street or the surrounding area specifically looking for the defendant. Id. at 56, lines 4-11. He admitted that he, personally, did not have information suggesting that there were other people in the upper unit. Id. at 57, lines 4-14.

On the second day of testimony, Officers Ayala and Cline testified for the government and James Hutchinson testified for the defense. Dkt. No. 45 at 2. Hutchinson, who is a captain with the Milwaukee Police Department, was called for the sole purpose of establishing that Ayala worked eleven days between May 29 and June 22. Id. at 6, lines 16-18; 7, lines 11-25; 8 lines 1-17.

Ayala testified that he worked as a City of Milwaukee police officer for twenty-four years, was assigned to the special investigations division and was a federal task force officer to the Bureau of Alcohol, Tobacco, Firearms and Explosives. Id. at 10, lines 13-24. Ayala testified that an anonymous citizen had contacted him on May 24, 2022 and that, in addition to the information to

7

which the parties stipulated, the citizen had warned Ayala that the defendant was armed at all times. Id. at 11, lines 14-22. Ayala testified that he then learned the defendant had outstanding warrants. Id., lines 23-25; 12, lines 1-2.

Ayala testified that on June 3, 2022, he applied for and received the order for the trap and trace warrant of the defendant's cell phone and that once it was authorized, he provided the information to Officer Randazzo. Id. at 12, lines 7-21. Ayala testified that Randazzo told him on June 22, 2022 that the phone was pinging at the address of 4108 North 13th Street. Id., lines 22-25; 13, lines 1-7. Ayala testified that he and eleven other officers went to the location at approximately 11:00 a.m. Id. at 15 lines 5-8; Dkt. No. 32 at ¶5. Ayala testified that although his report indicated that Randazzo used a handheld device to determine that the phone was pinging from the upper unit, Ayala later discovered that the device mentioned in the report was not used. Dkt. No. 45 at 14, lines 13-25; 15, lines 1-4.

Ayala testified that he spoke with two neighbors who wanted to stay anonymous due to fear of retaliation, so his body cam was turned off at that point. Id. at 16, lines 3-9. Ayala testified that he knew there was an upper and lower unit at 4108 North 13th Street and that the upper unit was supposed to be vacant, which he later confirmed with the City of Milwaukee, the owner of the property. Id., line 24 through 19, line 6. Ayala testified Cline told him that while they were clearing the residence for any additional individuals, he came across a magazine for a firearm that was loaded with ammunition. Id. at 19, lines 7-19. Ayala testified that officers froze the scene to obtain a warrant for

8

the search of the residence. Id., lines 20-24. Ayala knew that it would be illegal for the defendant to possess ammunition because the defendant had a prior conviction. Id., line 25; 20, lines 1-6.

On cross-examination, Ayala admitted that on June 22, 2022, the only thing he knew about the occupancy of the upper unit at 4108 was what Officer Randazzo told him about the location of the phone. Id. at 21, lines 8-24. Ayala testified that he knew the defendant was in the upper unit after speaking to the occupants of the lower residence and to two neighbors, who, after looking at a booking photo, said they believed he lived in the upper unit. Id. at. 22, lines 23-25; 23, line 2; 26, lines 11-25; 27, lines 1-2. Ayala testified that the defendant answered to his name when the officers called out as they knocked on the door. Id. at 23, lines 3-15. Ayala testified that he did not see the defendant in the area of the arrest between May 24th and June 22nd, 2022. Id. at 25, lines 8-19.

Ayala testified that the officers were on the scene "[a]t least an hour" before they arrested the defendant. Id. at 26, lines 4-6. He testified that he could not recall if he had mentioned his conversation with the two anonymous citizens to other officers. Id. at 29, lines 3-20. Ayala testified that at some point, he told his supervisor that he was talking to the citizens and that they had told him that the defendant lived upstairs. Id. at 30, lines 3-13.

Ayala testified that the anonymous citizen referenced in his June 3, 2022 application for the trap and trace warrant and his June 22, 2022 narrative report were the same individual. Id. at 36, lines 3-11. He testified, however,

9

that the "confidential source" that pinpointed the defendant to 4108 13th Street actually was the trap and trace results. Id., lines 24-25; 37, lines 1-13. Ayala testified that the phone number associated with the red iPhone recovered during the search was not the subject of the trap and trace, and that the officers never recovered the phone associated with 414-676-5813. Id. at 39, line 14 through 41, line 1. Ayala testified that on the date of the arrest he had no information that the defendant had company in the upper unit. Id. at 50, lines 1-5.

Officer Cline testified that he had worked for the Milwaukee Police Department for approximately nineteen years and had been assigned to the fugitive apprehension unit. Id. at 54, lines 8-18. He testified that he knew the defendant had a felony warrant and violation of probation. Id. at 57, lines 1-10. Cline testified that he was aware that Randazzo had tracked the phone for the defendant. Id. at 58, lines 3-9. Cline testified that he heard someone say on the radio that the defendant most likely would be located at the address of 4108 North 13th Street. Id., lines 24-25; 59, lines 1-7. Cline and others arrived at the scene at approximately 11 a.m. Id., lines 11-13.

Cline testified that once at the scene, he contacted the resident in the lower unit, Debra, while his body camera was active. Id. at 60, lines 10-21. Cline testified that the resident of the lower unit told him that there were people in the upper unit the night before and that the property was owned by the City of Milwaukee. Id. at 61, lines 16-24; 62, lines 9-11. Debra agreed to open the side door to allow the officers to go to the basement and to access the

stairs to the entry door for the upper unit. Dkt. No. 32 at ¶6. Debra stated that her son used the bedroom in the basement. Id. Cline and two other officers cleared the basement. Id. at ¶7.

Cline and other officers went up the stairs; Cline and Officer Dewitt were located on the landing adjacent to the entry door to the upper flat. Id. at ¶8. At approximately 11:16 a.m., Cline knocked on the door three times but received no response. Id. Cline testified that he and Dewitt heard movement inside the residence (described as someone possibly running around) on at least two occasions and reported that to other officers on the scene. Id. Cline continually announced that they were the Milwaukee Police Department, stated that the defendant had a felony warrant for his arrest and requested that the defendant open the door. Id. Cline testified that he heard something similar to a firearm with its slide being racked. Dkt. No. 45 at 63, lines 21-25. At the 27:45 timestamp on Cline's body cam, a male voice stated, "Dang, I'm coming out." Dkt. No. 32 at ¶8. No one came out. Id.

Forty-four minutes after officers approached the door to the upper unit, they forced entry and immediately arrested the defendant, who was standing on the other side of the door. Id. at ¶10. Cline asked if anyone else was in the apartment (the answer can't be heard on the body cam footage) and at approximately 12:04 p.m., officers escorted the defendant out of the residence. Id.

Cline testified about several reasons for the protective sweep. Debra had told him there were others there the night before; it took a long time for the

defendant to come out and Cline was concerned for his own safety and the safety of the other officers; and Cline was concerned about the "running around" movement he heard inside the unit and the sound that he believed to be someone racking a slide. Dkt. No. 45 at 65, lines 23-25; 66, lines 1-11.

Cline testified that inside the upper unit there was a hallway, a kitchen to the right, a living room a bathroom and two bedrooms. Id. at 66, lines 19-25; 67, lines 1-7. There also was a closed opening in the ceiling leading to an attic or storage space. Dkt. No. 32 at ¶11. Cline testified that he swept the two bedrooms and a bathroom. Dkt. No. 45, at 68, lines 14-19. According to Cline, the northwest bedroom had a closed closet door that he opened, which led to a walk-in closet. Id. at 69, lines 1-11. Cline testified that when he opened the door, he saw a firearm magazine in plain view and determined that it was loaded. Id., lines 24-25; 70, lines 1-5. The officers continued to clear the residence from 12:04 to 12:23 p.m. Dkt. No. 32 at ¶11. Cline testified that after the residence was cleared, he and his partner transported the defendant for the booking process. Dkt. No. 45 at 71, lines 22-25

On cross-examination, Cline testified that at the time of the arrest, officers did not have a search warrant to go into the house and that he had never had contact with the defendant prior to June 22, 2022. Id. at 73, lines 8-14. Cline testified that Officer Dewitt breached the door with the battering ram, the defendant was in the doorjamb and another officer put cuffs on the defendant at the top of the stairs. Id. at 74, lines 17-25; 75, lines 1-12. Cline

12

testified that he communicated to the other officers that he thought he heard a firearm in the upper unit. Id. at 76, lines 23-25; 77, lines 1-10.

Judge Joseph asked for clarification and Cline stated that officers breached the door only after they had given the defendant every opportunity to surrender, advised the defendant that he had a felony warrant and that they would breach the door if he didn't come out, identified themselves as officers and gave him "an incredible amount of time to come on out, and he did not." Id. at 84, lines 4-15. Cline estimated that it was about the twenty- or thirty-minute mark when the defendant said "Dang, I'm coming out." Id., lines 20-23.

The parties stipulated to the admission of Officer Lastrilla's body cam footage. Dkt. No. 32 at ¶12. Lastrilla entered the upper unit at approximately 12:04 p.m. and her body cam was on from that time as she assisted other officers looking for other subjects in the residence until the upper unit was deemed clear at 12:22 p.m. Id. No one else was found in the upper unit. Id. The scene was frozen while Ayala applied for the search warrant based on the drum magazine filled with ammunition found by Cline. Id.

E.     Defendant's Post-Hearing Brief (Dkt. No. 46)

In his post-hearing brief, the defendant argued that there was "no credible evidence that the police knew that the defendant was in the upper unit on June 22, 2022 before the police forced entry." Dkt. No. 46 at 5. The defendant emphasized that Officer Ayala did not refer to the anonymous citizen in the application for the trap and trace warrant, that Officer Randazzo testified that he did not tell Ayala that the defendant's phone was in the upper unit and

13

that the defendant said that the existence of the "2 phantom anonymous citizens first appeared in Officer Ayala's error-ridden supplemental report." Id. at 5-6. The defendant said that the trap and trace information that placed the defendant's cell phone at 4108 N. 13th Street was not supported by documentation. Id. at 6. According to the defendant, the "shadow of doubt is only darkened because the defendant's phone was not recovered during the exhaustive searches of the upper unit following the defendant's arrest." Id. The defendant asserts that because the officers lacked probable cause to believe that the defendant was in the unit and because they illegally forced entry, the court must suppress the fruits of the subsequent search. Id.

With respect to the arrest warrant, the defendant argued that that warrant did not authorize officers to enter a third person's home to execute a search warrant. Id. at 7 (citing Steagald v. United States, 451 U.S. 204, 213-14 (1981)). The defendant asserted that there were no exigent circumstances permitting forced entry. Id. at 8.

The defendant argued that after the forced entry, the officers cuffed the defendant but continued to sweep the unit without any basis to believe that there was anyone else there. Id. at 9. Officer Cline observed the drum magazine on the floor of a closet only after he opened the door; the other officers looked under a mattress, picked up laundry baskets and peeked into an attic's interior. Id. The defendant argued that there were no specific, articulable facts that could reasonably have led the officers to believe there was anyone else in

14

the upper unit to justify the protective sweep and that the court should suppress the evidence seized during the sweep.

Finally, the defendant argued that the application for the search warrant cited the drum magazine from the protective sweep, but that that sweep was illegal. Id. at 11. The defendant argued that without the discovery of the drum magazine, the officers lacked probable cause for the search of the upper unit. Id. The defendant attached the warrant and the affidavit supporting the warrant to the post-hearing brief. Id. at 12-21.

F.    Government's Post-Hearing Opposition Brief (Dkt. No. 47)

The government responded that the defendant had no legitimate expectation of privacy because he was a trespasser or squatter. Dkt. No. 47 at 5-6. Officer Ayala had confirmed that the upper unit was supposed to be vacant. Id. at 5. The City of Milwaukee owned the residence and the last two known tenants had vacated in May of 2022. Id. The defendant had no legal right to be at the property because he did not have a lease with the landlord. Id. at 6.

Next, the government argued that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe that suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980); United States v. Jackson, 576 F.3d 465, 468 (7th Cir. 2009). The government explained that Payton doesn't completely resolve the issue because it involved an in-home arrest in a defendant's home while here, the defendant insisted

15

that he was just "staying" at the unit. Id. at 6-7. The government argued that Jackson authorizes the execution of an arrest warrant in a third-party residence where the officer has reasonable cause to believe the defendant is present. Dkt. No. 47 at 7 (citing Jackson, 576 F.3d at 468). The government acknowledged that the Seventh Circuit has not determined whether "reason to believe" in this context is synonymous with probable cause but argued that, under either standard, the totality of the circumstances demonstrated a reasonable probability that defendant was present. Id.

The government pointed out that at the time of the arrest, officers had corroborated the information by the anonymous source that defendant was wanted, armed and lived near 13th and Fiebrantz. Id. The anonymous source had said that the defendant used a cell phone ending in 5813. Id. Officer Ayala had confirmed that the defendant had felony warrants and had applied for a search warrant. Id. at 7-8. Results from the warrant obtained to locate the phone number ending in 5813 revealed that the phone was located at 4108 N. 13th Street. Id. Two separate officers confirmed with three different neighbors that the defendant resided there. Id. The officers knocked and announced their presence and, after they said they were there for the defendant, the defendant said "Dang, I'm coming out." Id.

With respect to the protective sweep, the government argued that the sweep was justified under both prongs of Maryland v. Buie, 494 U.S. 325, 334 (1990). Id. at 11. First, the defendant was arrested in a hallway and the government argued that areas adjacent to the arrest site are searchable

without reasonable suspicion or probable cause to protect officer safety. Id. Second, the officers reasonably believed that there might be others in the unit because the lower tenant said that many people were in and out and Officer Cline heard movement and a clicking noise similar to a slide being racked Id. Further, Cline knew that the defendant had a prior conviction for being a felon in possession and was wanted for recklessly endangering safety. Id. at 11-12. The government noted that the portion of the sweep at issue lasted approximately three minutes, or "no longer than necessary to dispel the reasonable suspicion of danger;" Cline opened the closet door and immediately observed the drum magazine filled with ammunition in plain view. Id. at 12. Cline testified to his experience that an officer—-during another arrest—had been ambushed and killed by a subject hiding under a pile of clothing. Id. (citing Dkt. No. 45, at 70, line 25; 71, lines1-7). The remaining time spent in the protective sweep—approximately twenty minutes—involved the attic space, which "was both difficult and dangerous to access and clear." Id.

The government argued that the search warrant affidavit "reflected that there was a fair probability that evidence of a crime would be found in 4108 N. 13th Street." Id. at 15. The government cited the following:

> The affidavit established that defendant possessed a firearm and was identified by two sources as being involved in a shooting on April 13, 2022. Defendant was also known to possess firearms given his recent prior conviction for being a felon in possession of a firearm. Officer Ayala, who has nineteen years of experience as a law enforcement officer and who has executed numerous search warrants for firearms, also knew that defendants often keep firearms for long periods of time at their residences. To that end, on Wednesday June 22, 2022, after knocking on the door for thirty minutes, the defendant was arrested at 4108 N. 13th Street. And

17

while the affidavit reflects defendant stated he did not live at that location, it is reasonable to infer that he resided there given officers located him at the residence early in the day on a weekday. Defendant also took more than thirty minutes to answer the door supporting the inference that he may have had something to hide and further, that such a delay provided the means for him to hide something in the residence. Taken together, the judge reviewing the affidavit, even without evidence of the drum magazine filled with ammunition in the closet, could reasonably infer that there was a fair probability that evidence of a crime could be found in the home.

Id.

Finally, the government argued that the good faith exception applied and that the defendant had not rebutted the presumption. Id. at 15-16. The government argued that there was a fair probability that evidence would be uncovered at the location because (1) the defendant was involved in a shooting and was arrested at 4108 N.13th Street a few months after the shooting incident; (2) the protective sweep revealed the drum magazine loaded with ammunition; (3) the defendant had a prior conviction for being a felon in possession; and (4) the defendant took thirty minutes to open the door after the officers knocked and announced their presence. Id. at 16.

G.  Defendant's Post-Hearing Reply (Dkt. No. 49)

The defendant replied that there was no credible proof that the prior tenant had moved out of the upper unit in May 2022. Dkt. No. 49 at 1. Immediately following the arrest, "Lee" told Detective Rom that he moved out but that he hadn't told anyone. Id. The defendant reasoned that it was not unlikely that any tenant whose leased dwelling contained contraband and was surrounded by officers would lie and say he no longer lived in the unit. Id. The

18

defendant said that this was the only evidence of law enforcement's knowledge of whether someone lived in the unit. Id. at 1-2.

The defendant also pointed out that government never produced the arrest warrants at the evidentiary hearing. Id. at 2. The defendant argued that Debra, the resident in the lower unit, said she hadn't heard anyone in the upper unit since the previous night. Id. The defendant insisted that the court could not rely on Officer Ayala's alleged interview with two neighbors because he never mentioned the interview until he wrote a "mistake laden" report on March 15, 2023. Id. at 2-3.

As for the protective sweep, the defendant stated that he told officers that he was allowed to stay in the unit when he "[came] through" and needed a place to sleep. Id. The defendant alleged that he should have been considered a guest and that an invited guest has a reasonable expectation of privacy. Id. (citing Minnesota v. Olson, 495 U.S. 91, 96-97 (1990)). The defendant pointed to body cam evidence suggesting that the officers had no idea of the occupancy status before and after the arrest. Id. at 4. For example, Officer Cline said, "To be honest with you Kim don't even know this guy's full name." Dkt. No. 41, Ex. 4 at 38:18. Cline could be heard in the body cam footage saying, "Stand by on that. I don't know if this is his; I don't know who has standing here. He's on papers. I just don't know enough. I know the lady downstairs is real cooperative so maybe ask her. Just talk to her real quick. I don't think she owns this upper though. That's the only thing but I could be wrong." Dkt. No. 41, Ex. 2 at 56:55-57:16.

19

The defendant reiterated that the provider deleted the cell phone records, and that contrary to Ayala's testimony, Officer Randazzo never told Ayala that the cell phone was in the upper unit. Id. at 5. The phone never was recovered from the unit. Id. The defendant also pointed out that Debra never said that the defendant "lived in the upper" and that no officer had ever seen or heard the defendant prior to June 22, 2022 (so they couldn't have identified his voice.). Id. at 6. The defendant said that Cline's "hunch" wasn't enough to justify forced entry or issuance of the search warrant. Id.

The defendant emphasized that there was no reason to believe that there were other people in the upper unit at the time of the arrest. Id. at 7. The defendant asserted that Cline and Lastrilla's body cam footage showed them searching in places where people couldn't be located. Id. at 8. The defendant argued that the government did not have an expert testifying that the defendant was dangerous, that there were no allegations of drug trafficking, that there were no people present in the residence, that there was no need for officers to spend time with the defendant in proximity of the residence and there were no other indicia of other people present in the upper unit. Id. at 11.

As for the good faith doctrine, the defendant argued that Ayala knew or should have known that there was no reason to believe anyone else was present in the upper unit and that Cline's search of the closet situated fifty to sixty feet from where the defendant was arrested went beyond the protective sweep. Id. The defendant asserted that it was "apparent that Officer Ayala misled the issuing magistrate by stating that the drum magazine was found

20

during a legal search for lurking confederates when Officer Ayala knew or should have known that the 'protective sweep' was unnecessary and exceeded the scope permitted by the 'protective sweep' doctrine." Id. at 13.

## II. Magistrate Judge Joseph's Report and Recommendation (Dkt. No. 50)

In her recommendation that this court deny the motion to suppress, Judge Joseph addressed the defendant's arguments that (1) law enforcement lacked probable cause to believe that the defendant was located in the upper unit when they forced entry and arrested him; (2) the protective sweep exceeded the allowable parameters of Maryland v. Buie, 494 U.S. 325 (1990); and (3) the warrant for the search lacked probable cause and could not be saved by the good faith exception. Dkt. No. 50 at 6.

### A. Entry into the Residence to Execute the Arrest Warrant

Judge Joseph explained that for Fourth Amendment purposes, an arrest warrant founded on probable cause carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the subject is there. Dkt. No. 50 at 6 (citing Payton, 445 U.S. at 603). She acknowledged that Payton addressed entry into a defendant's own home but cited the Seventh Circuit's decision in Jackson for the reasoning that "law enforcement officers do not need a search warrant in addition to an arrest warrant to enter a third party's residence in order to effect an arrest." Jackson, 576 F. 3d at 468. She recounted that the Jackson court allowed officers to enter a residence to execute an arrest warrant if they have "reasonable belief" that the suspect is within and the court said it "might be inclined to adopt the

21

view of the narrow majority of our sister circuits that 'reasonable belief' is synonymous with probable cause." Id.

Turning the question of probable cause, Judge Joseph found that the officers had probable cause to believe that the defendant was in the upper unit at the time of the forced entry. Id. at 8. She noted that law enforcement had learned from an anonymous citizen that the defendant was living in the area of North 13th and Fiebrantz and that his phone number was 414-676-5813; that officers had used technology authorized by a state warrant to confirm the phone associated with the defendant was frequently in the area of North 13th and Fiebrantz; and that on the day of the arrest, law enforcement had used a cell site simulator to narrow down the signal from the device associated with the defendant to 4108 North 13th Street. Id.

Judge Joseph found that officers had made contact with the resident in the lower unit, who confirmed that the defendant did not live in the lower unit or basement; officers had gone down to the basement but had not found anyone present. Id. at 8-9. Judge Joseph determined that it was reasonable for the officers to conclude, by process of elimination, that the phone signal was coming from the upper unit. Id. at 9.

Judge Joseph observed that rather than immediately breaching the upper unit's door, Officer Cline had ascended the stairs and repeatedly announced that the Milwaukee Police Department was present and had a felony warrant for the defendant's arrest and that the defendant should open the door. Id. Judge Joseph reviewed body cam video evidence and found it

22

reasonable for the officers to believe that the defendant was responding to them because Cline made repeated pleas for the defendant to come out and the male voice said "Dang, I'm coming out." Id. at 9. Judge Joseph found that the officers had probable cause to enter the upper unit to execute the arrest warrant for the defendant. Id.

Judge Joseph concluded that the officers were justified in breaching the door under the authority of the warrant. Id. After watching the entirety of the video, she found that the officers "showed tremendous patience in attempting to coax [the defendant] out of the residence prior to breaching the door; Officer Cline talked and pleaded with [the defendant] for nearly forty minutes." Id. at 10. She found that even after officers heard the voice say he was coming out, the officers continued to wait. Id. For those reasons, Judge Joseph recommended that this court deny the motion to suppress based on forced entry.

B.    Protective Sweep

Although the defendant argued that the officers did not know that the upper unit was unoccupied prior to the arrest, Judge Joseph found that whether the defendant had a reasonable expectation of privacy in the upper unit did not turn on the officers' knowledge but the defendant's subjective expectation of privacy. Id. at 11 (citing United States v. Mendoza, 438 F.3d 792, 795 (7th Cir. 2006)).

Judge Joseph recounted that Officer Elm's body cam footage showed him speaking on the phone to "Lee" on June 22, 2022; Lee was the last person

23

listed as a tenant in the upper unit. Id. at 11. Lee told Elm that he had moved out a month before but had not told anyone. Id. Officer Ayala testified that he had learned from the City in August 2023 that the upper unit was rented in 2021 to two known tenants who vacated it in May of 2022. Id. The City initiated a notice to vacate on July 19, 2022 and the eviction occurred on September 20, 2022. Id. Judge Joseph observed that from Ayala's body cam video, the defendant's voice could be heard repeatedly stating that he didn't "stay" at the apartment but that a friend let him sleep there when he needed to and that a girl let him in. Id. Judge Joseph wrestled with the fact that it wasn't clear whether Lee was the friend who allowed the defendant to stay; she explained that if Lee was the legal tenant and did not give the defendant permission to stay, then whatever "host" let the defendant in did not have legal authority to do so. Id. at 12. Judge Joseph stated that the defendant had the burden to establish a reasonable expectation of privacy and that his evidence was "weak, at best." Id.

Judge Joseph ultimately concluded that even if the defendant could establish that he was the guest of a lawful tenant, the evidence did not support an actual or subjective expectation of privacy. Id. The evidence revealed that after being placed in the squad car, the defendant could be heard saying that he did not "stay" at the apartment and that he just went there when he needed a place to sleep. Id. at 12-13. Without a reasonable expectation of privacy in the upper unit, Judge Joseph found no violation of the Fourth Amendment. Id. at 13.

Judge Joseph explained that even if the defendant had had a reasonable expectation of privacy in the upper unit, he had not demonstrated that the officers had exceeded the permissible parameters of the protective sweep. Id. The officers were told by the downstairs tenant that she had not heard noises since the previous night, but the officers themselves heard movement when they were outside the door. Id. at 14. Judge Joseph explained that the officers had "clearly express[ed] concern that others" in addition to the defendant could be present in the upper unit; Cline could be heard calling to the defendant "or anyone else inside" and announcing that anyone hiding the defendant would be arrested for harboring a fugitive. Id. at 14-15. Judge Joseph concluded that given the downstairs tenant's statement that multiple people had been going in and out and the fact that the officers heard movement, the sweep was reasonable. Id. at 15. She wrote:

> Further, I do not find the officers exceeded the scope of the protective sweep. The body cam videos for Officers Cline and Lastrilla show law enforcement opening closed doors to rooms, looking in closets, looking under beds, and checking the attic. . . . The closets are full of items on the floor, and the officers quickly move the items aside to check if someone is underneath. Officer Cline testified that he has arrested subjects on multiple occasions hiding in closets, attics, up in rafters, between walls, inside sofas and mattresses, and inside dryers and washing machines. . . . He further testified that a friend and colleague was killed when ambushed by a wanted subject concealed underneath items of clothing. . . . Again, a protective sweep may extend only to a cursory inspection of those spaces where a person may be found and only as long as is necessary to dispel the reasonable suspicion of danger. *Buie*, 494 U.S. at 335–36. Given the totality of the circumstances from the prospective of the officers on scene, I find the officers did not exceed the scope of the protective sweep.

Id. at 15.

C. June 22, 2022 Search Warrant

Because Judge Joseph found that neither the entry nor the sweep were illegal, she rejected the defendant's argument that the evidence of the drum magazine should be excised from the affidavit in support of the search warrant as fruit of the poisonous tree. Id. at 16. Officer Ayala had averred in the affidavit that the defendant was a convicted felon (Milwaukee County Case No. 2017CF371); Officer Cline had found the drum magazine with unspent cartridges in plain view in the closet during the protective sweep; and Ayala had averred that weapons are often secreted in residences. Id. at 17. Judge Joseph concluded that the affidavit provided the requisite probable cause.

D. The Good Faith Exception

Judge Joseph agreed with the government that even if the June 22, 2022 warrant was legally defective, it was saved by the Leon good faith exception. Id. at 18 (citing United States v. Leon, 468 U.S. 897 (1984)). She found that the government had demonstrated by a preponderance of the evidence that the police had relied in good faith on the judicial official's decision to issue the warrant. Id. She explained that in order to rebut the good faith presumption, the defendant may show that 1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) the magistrate wholly abandoned his neutral, detached judicial role and simply rubber-stamped the warrant application; or (3) the warrant was based on an affidavit so lacking in *indicia* of probable cause that no reasonable officer could have relied on it. Id. (citing Leon, 468 U.S. at 923). Judge Joseph found that Officer Ayala's

26

statement in the affidavit regarding conducting the sweep to look for hiding confederates was not deliberately or recklessly false. Id. at 18-19. She concluded that the defendant failed to rebut the presumption that the officers were acting in good faith.

### III. Briefing To this Court

    A.   <u>Defendant's Objection</u> (Dkt. No. 51)

In seeking *de novo* review of Judge Joseph's report and recommendation, the defendant asserts that the background section of the report is "substantially accurate" but says that certain facts need "additional context." Dkt. No. 51 at 1. For example, he emphasizes that Officer Ayala testified that Officer Randazzo told him the phone was in the upper unit but that Randazzo said that he was unable to determine whether the signal was coming from the upper or lower unit. Id. at 1-2. Ayala said that he realized the report was inaccurate a couple months after he prepared it but never issued a correction. Id. at 2. The defendant also takes issue with the fact that Judge Joseph never mentioned that the defendant's phone was not recovered during the search, even though Randazzo had a handheld device that would have allowed for its detection. Id. He points out that Ayala testified that he was not 100% confident that the defendant was behind the door prior to it being breached. Id.

The defendant argues that on page three of the recommendation, Judge Joseph failed to mention that officers did not discover that the two tenants had vacated the upper unit until after the officers broke down the door. Id. at 3. He argues that Judge Joseph should have clarified that different people were in

27

the upper unit *in the past* and that Officer Cline testified that he failed to see or hear anything that would cause him to believe that others were present after the arrest. Id. The defendant believes that Judge Joseph should have explained that the northwest bedroom closet was fifty to sixty feet from the door where the defendant was apprehended and that the door to the closet was closed. Id. Finally, the defendant says Judge Joseph ignored the portions of Officer Lastrilla's body cam recordings showing the officers looking for "more than other subjects" during the sweep, such as the search in the attic and other spaces that could not hide someone. Id. at 4.

In terms of the legal arguments, the defendant says the officers lacked probable cause to believe the defendant was inside the upper unit. Id. at 4-5. The defendant focuses on the facts that the anonymous source failed to provide the basis for his or her knowledge and that the trap and trace records located the phone between April 18 and June 3 but that the defendant was not arrested until June 22, 2022. Id. at 5-6.

The defendant says that Randazzo failed to produce any records memorializing the cell site simulator's readings and that the defendant's phone was never recovered. Id. at 6. The defendant argues that the reliability of the testimony of the use of the cell site simulator is further called into question by Ayala's testimony that Randazzo told him the phone was in the upper unit. Id. The defendant asserts that whether the cell site simulator actually located the defendant's phone was not established by a preponderance of the evidence. Id. at 6-7.

28

The defendant says that the downstairs neighbor having said that she saw the defendant and the officers hearing someone say "I'm coming out" don't make the defendant's presence in the upper unit more likely than not, pointing out that the downstairs resident did not say where or when she had seen the defendant and that a male voice stating he was coming out in response to Cline's commands does not identify the defendant as the male who said it. Id. at 7. The defendant emphasizes that no one had seen the defendant in the upper unit or even in the area. Id.

As for the reasonable expectation of privacy, the defendant says that he informed officers that he was "essentially an invited guest." Id. at 8. The upper unit was leased to two people and the eviction didn't occur until after the arrest. Id. The defendant argues that the government offered no evidence to contradict the defendant's assertion that he was an invited guest. Id.

The defendant further argues that the officers had no specific and articulable facts supporting a reasonable belief that there was anyone else in the upper unit. Id. at 9. Ayala's anonymous source didn't mention other people. Id. No officers saw other people in the upper unit. Id. The downstairs tenant last heard noises the night before. Id. The defendant was standing just on the other side of the door when it was breached. Id. According to the defendant, Cline said he didn't see or hear anything suggesting others were present. Id.

While Judge Joseph pointed to conversation with the downstairs tenant about multiple people going in and out of the upper unit, the defendant argues that there was no evidence as to when the tenant actually saw anyone. Id. at 9-

10. Along the same lines, the defendant argues that the officers didn't have a reasonable fear that there were others present who posed a danger to the officers or others, making the protective sweep illegal. Id at 10.

The defendant preserves his argument that the drum magazine should have been excised from the affidavit in the event that this court reverses the findings regarding the validity of the protective sweep. Id. at 11. Likewise, the defendant preserves his objection to the application of the good faith exception. Id. at 12.

B.     Government's Response (Dkt. No. 52)

The government responds that the officers had probable cause to believe that the defendant both lived in the unit and was present when officers entered. Dkt. No. 52 at 3-4. The government initially argued that Jackson requires only that officers have probable cause to believe the subject of the warrant would be located there. Id. at 2. In its opposition brief, however, the government added that it doesn't matter whether the court applies the two-pronged Payton test or the single prong Jackson test. Id. at 2-3.

Regarding probable cause to believe the defendant was at 4108 North 13th Street, the government says that the anonymous citizen placed the defendant in the vicinity and provided the phone number. Id. at 3. The technology authorized by the search warrant placed the phone at 4108 N. 13th Street. Id. Officer Cline spoke with the tenant in the lower unit and determined that the defendant must have been in the upper unit. Id. The voice in the unit

responded to calls for the defendant to come by saying, "Dang, I'm coming out."
Id.

Regarding probable cause to believe that the defendant lived at the address, the government argues that the same evidence (the anonymous tip, the location data for the phone), combined with the fact that law enforcement interviewed three neighbors who testified that the defendant was living at 4108 North 13th Street, reasonably supported a finding that the defendant lived at "or, at a minimum, had a significant relationship" to the address. Id. at 3-4.

The government responds to the defendant's privacy arguments by emphasizing that the defendant has not shown an expectation that society is prepared to recognize. Id. at 4. The government says that "Lee" rented the upper unit and vacated it in May of 2022. Id. The property wasn't rented to anyone else after that. Id. at 4-5. The government asserts that a trespasser or squatter or someone unlawfully present at the property doesn't have a privacy interest under the Fourth Amendment. Id. at 5 (citing United States v. Curlin, 638 F.3d 565, 565-56 (7th Cir. 2011)). The government argues that while the defendant says he was a guest, he never said who allowed him to stay there. Id. The government argues that the defendant did not have an expectation of privacy in the upper unit: he had no property in the unit, no keys to the unit and repeatedly said he did not stay there. Id.

The government alleges, based on the argument in its response brief and the facts cited by Judge Joseph (all of which the government incorporates by reference), that the officers were justified in conducting the limited protective

31

sweep, which revealed the drum magazine in the closet. Id. According to the government, the search warrant—based primarily on the discovery of the drum magazine and the fact that the defendant was a known felon—was supported by probable cause.

C.    Defendant's Reply (Dkt. No. 54)

The defendant continues to focus on the fact that Officer Ayala never saw the defendant in the neighborhood in the time between the anonymous tip and June 22, 2022. Dkt. No. 54 at 1. The defendant says no other officer had seen the defendant prior to breaching the door. Id. According to the defendant, the search warrant return included only records confirming the location of the phone as of June 3, 2022 and even though Officer Randazzo testified that the defendant's phone was located at 4108 North 13th Street on June 22, 2022, the phone never was recovered. Id. The defendant says that officers had never heard the defendant's voice so they could not confirm the voice behind the door was his. Id. at 2.

The defendant cites the fact that the government never identified the three people who told Ayala that the defendant was living in the upper unit. Id. at 2. The defendant asserts that Officer Cline's body cam video revealed the downstairs tenant saying she had seen the defendant but never confirming that he was living there. Id. The defendant maintains that the existence of the other two witnesses is "especially suspect" because Ayala never mentioned them before preparing his supplemental report on March 15, 2023. Id.

32

As to an expectation of privacy, the defendant says that, contrary to the government's assertion that he "repeatedly stated that he did not stay in the upper unit," he did state that he had stayed there on multiple occasions in the past. Id. at 3. The defendant says that the problem with the government's reliance on "Lee" having vacated the upper unit (making the defendant a trespasser or squatter) is that the apartment was leased to two people and was still fully furnished on June 22, 2022. Id. The defendant says "Lee" mentioned that he had vacated the premises only during a June 22, 2022 phone conversation when he was asked to return to the apartment by a member of the apprehension team. Id. The defendant says he was permitted entrance by a woman when he needed a place to sleep. Id. The defendant reiterates that this establishes his status as an invited guest and thus his privacy interest.

Finally, the defendant continues to argue that officers exceeded the scope of the protective sweep because they didn't have reason to believe anyone else was there. Id. at 3. He repeats that Cline testified that he hadn't seen or heard anyone immediately after the arrest but that Randazzo still went fifty to sixty feet into the apartment to the bedroom and opened the door to the closet. Id. at 3-4. The defendant asserts the officers should have accompanied him out of the stairwell and waited for the search warrant or left the property. Id. at 4.

## IV.    Standard of Review

Federal Rule of Criminal Procedure 59(b) governs a district court's referral of motions to dismiss to magistrate judges. Parties have fourteen days to file "specific objections" to a magistrate judge's report and recommendation

33

to a motion to dismiss. Fed. R. Crim. P. 59(b)(2). The district judge must review *de novo* the portions of the magistrate judge's recommendations to which a party timely objects. 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. §636(b)(1).

## V.    Analysis

Even with the "context" provided by the defendant, the facts are largely undisputed. The defendant's objections focus on the forced entry to and execution of a warrant in an upper unit not owned or rented by the defendant, the protective sweep that uncovered a drum magazine loaded with ammunition and the subsequent application for a warrant to search the unit.

### A.    Execution of the Arrest Warrant and Forced Entry

#### 1.    *Applicable Law*

The defendant has argued that the government did not prove by a preponderance of the evidence that probable cause existed for law enforcement to believe that the defendant was inside the upper unit. Dkt. No. 51 at 4. Judge Joseph concluded that the police lawfully entered the upper unit of the duplex on the morning that the defendant was arrested. Dkt. No. 50 at 7-10. This court agrees.

##### a.    Payton v. New York

The court begins its analysis with the consolidated appeals in Payton, where the defendants "challenge[d] the constitutionality of New York statutes that authorize police officers to enter a private residence without a warrant and

34

with force, if necessary, to make a routine felony arrest." <u>Payton</u>, 445 U.S. at 574. In each of the appeals, police officers had gone to the appellant's residence to arrest the appellant on a felony charge; in each, the officers had probable cause but no warrant; and in each, they had entered the residence without consent. The Court confronted the question of "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." <u>Id.</u> at 574-75 (quoting <u>United States v. Watson</u>, 423 U.S. 411, 418 n.6 (1976)).

The <u>Payton</u> Court recounted that while "[t]he Fourth Amendment protects the individual's privacy in a variety of settings," nowhere "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." <u>Id.</u> at 589. Quoting the Fourth Amendment's mandate that "[t]he right of the people to be secure in their . . . houses . . . shall not be violated," the Court explained:

> That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 . . . [(1961)]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not be reasonable crossed without a warrant.

<u>Id.</u> at 589-90.

So—absent exigent circumstances, a warrant is required for law enforcement to enter a suspect's home. But what kind of warrant? In <u>Payton</u>, the State argued that "only a search warrant based on probable cause to believe the suspect is at home at a given time can adequately protect the

privacy interests at stake," and maintained that because obtaining a search warrant was impractical, no warrant of any kind was required. Id. at 602. The Supreme Court disagreed, concluding that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603. The Court reasoned that though "[i]t is true that an arrest warrant requirement may afford less protection than a search warrant requirement, . . . it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen." Id. at 602. In other words, "[i]f there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law." Id. at 602-03.

b.      Steagald v. United States

One year after deciding Payton, the Supreme Court decided Steagald, considering "whether, under the Fourth Amendment, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." Steagald, 451 U.S. at 205. The Court characterized the question as a "narrow" one: "whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances." Id. at 212. Officers had an arrest warrant for Ricky Lyons, and

36

information that he might be found in Gary Steagald's home. Id. at 206. But when officers entered Steagald's home, they did not find Lyons. Id. While searching Steagald's home, however, the officers uncovered narcotics. Id. at 206-07. Steagald was arrested and indicted on federal drug charges. Id. at 207. Steagald moved to suppress the narcotics found in his home. Id.

The Supreme Court discussed the difference between an arrest warrant (which the officers had for Ricky Lyons) and a search warrant.

> [W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review the interest protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

Id. at 212-13.

The Court found that the officers' arrest warrant for Lyons protected Lyons's interest in being free from an unreasonable seizure and authorized the officers to seize him. Id. at 213. But the Court observed that the officers had gone further than that—they had "relied on the warrant as legal authority to enter the home of a third person based on their belief that Ricky Lyons might be a guest there." Id. The Court opined that "while the warrant in this case may have protected Lyons from an unreasonable seizure, it did absolutely nothing to protect [Steagald's] privacy interest in being free from an unreasonable invasion and search of his home." Id. The only "protection" Steagald had from

an illegal entry and search of his home, the Court said, was the officers' personal probable cause determination—and that was not reliable enough to justify the entry or the search. Id.

The Steagald Court explained that "[a] contrary conclusion—that the police, acting alone and in the absence of exigent circumstances, may decide when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant—would create a significant potential for abuse." Id. at 215. It hypothesized that "[a]rmed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances," or could use the arrest warrant as a pretext for "entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place." Id. (citations omitted). The Court concluded,

> In sum, two distinct interests were implicated by the search at issue here—Ricky Lyons' interest in being free from an unreasonable seizure and petitioner's interest in being free from an unreasonable search of his home. Because the arrest warrant for Lyons addressed only the former interest, the search of petitioner's home was no more reasonable from petitioner's perspective than it would have been if conducted in the absence of any warrant. Since warrantless searches of a home are impermissible absent consent or exigent circumstances, we conclude that the instant search violated the Fourth Amendment.

Id. at 216.

c.    United States v. Jackson

Neither Payton nor Steagald involved a scenario where officers who had an arrest warrant for person A entered the home of person B to arrest person A and person A challenged that entry. Nor has the Supreme Court addressed that

38

scenario. But over twenty-five years after the Supreme Court decided Payton
and Steagald, the Seventh Circuit did.

Eric Jackson had an outstanding arrest warrant for aggravated battery.
Jackson, 576 F.3d at 467. Officers unsuccessfully searched for him at relatives'
residences, then got an anonymous tip that he had been staying at his father's
girlfriend's apartment and would be there the next day. Id. On arriving at the
identified residence—the home of LanDonna Joseph—the officers were invited
into the vestibule by Joseph, and they presented her with a photo of Jackson.
Id. After Joseph stated that she didn't recognize Jackson, the officers showed
the photo to another woman sitting nearby (as it happened, Jackson's
girlfriend), who, when asked if Jackson was inside, nodded and began to cry.
Id. The officers entered the apartment, found Jackson asleep in the back room,
arrested him and found a "pistol within grabbing distance under the blanket on
which he had been sleeping." Id. Jackson was charged with being a felon in
possession of a firearm. Id.

Jackson moved to suppress the firearm, arguing that "the police needed
a search warrant as well as an arrest warrant in order to enter Joseph's
apartment in order to arrest him." Id. Rejecting that argument, the Seventh
Circuit recounted Payton's holding that "an arrest warrant founded on
probable cause implicitly carries with it the limited authority to enter a
dwelling in which the suspect lives when there is reason to believe the suspect
is within." Id. at 468 (quoting Payton, 445 U.S. at 602). The court recited
Steagald's holding that because the "[arrest] warrant application process does

39

not protect the Fourth Amendment interests of third parties," "if officers enter a third party's residence in order to effect an arrest, the third party herself may have a Fourth Amendment claim against the officers." Id. (citing Steagald, 451 U.S. 204). The Seventh Circuit emphasized, however, that the Steagald Court was "quite explicit that 'the narrow issue before [the Court was] whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests *of persons not named in the warrant.*' [*Steagald*] at 212 . . . (emphasis added)." Id. at 468. Accordingly, the Seventh Circuit said, "[b]ecause it addresses only the Fourth Amendment rights of persons not named in an arrest warrant, *Steagald* did not hold that the subject of an arrest warrant has a higher expectation of privacy in another person's residence than he does in his own." Id. And, the court pointed out, "nearly every court of appeals to consider the issue has held that law enforcement officers do not need a search warrant in addition to an arrest warrant to enter a third party's residence in order to effect an arrest." Id. (collecting cases).

That said, the Seventh Circuit explained that while officers don't "need a search warrant to execute an arrest warrant in a third party's home, they do need some basis for believing that the suspect is actually present in the home." Id. The court pointed to Payton's holding that an arrest warrant "carries with it the limited authority to enter a dwelling when there is *reason to believe* the suspect is within," id. at 468-69 (emphasis in original) (quoting Payton, 445 U.S. at 602), and observed that courts of appeal were split on the meaning of "reasonable belief," id. at 469. The court explained that three circuits had held

that "reasonable belief requires a lesser degree of knowledge than probable cause," while four other circuits had held that "'reasonable belief' amounts to the same thing as 'probable cause.'" <u>Id.</u> (case citations omitted).

The Seventh Circuit stated that, while it might be inclined to side with the courts that found "reasonable belief" synonymous with "probable cause," it didn't need to decide that issue because the officers in <u>Jackson</u> had probable cause. <u>Id.</u> The court recounted that the officers had a tip that Jackson was staying at the apartment and would be there the next morning, and that when they arrived and asked Jackson's girlfriend if he was there she nodded and started crying; the court concluded that "[t]his was more than enough to lead a prudent person to believe that Jackson was inside the apartment when he or she entered." <u>Id.</u>

In 2016, the Second Circuit Court of Appeals came to the same conclusion, albeit using different language:

> We here adopt this reasoning as our own and join our sister circuits in concluding that the subject of a valid arrest warrant cannot complain that <u>his</u> Fourth Amendment right to be free from an unreasonable seizure was violated by apprehension in a third party's home, entry to which was not authorized by a search warrant. The arrest-warrant subject has no greater privacy rights in such circumstances than he would have had if the arrest had been made in his own home. Thus, if, at the time of entry, law enforcement officers possessed a valid warrant for the subject's arrest and reason to believe that he was on the premises entered, the subject of the arrest warrant will not be heard to complaint that entry was not authorized by a search warrant.

<u>United States v. Bohannon</u>, 824 F.3d 242, 251 (2d Cir. 2016).

41

d.    The Applicable Legal Standard in This Case

Payton held that for Fourth Amendment purposes, an arrest warrant for a suspect, coupled with "reason to believe" that the suspect is present in his home, is sufficient to authorize law enforcement to enter the *suspect's* home to arrest him. Payton, 445 U.S. at 602; see also United States v. Agnew, 407 F.3d 193, 196 (3d Cir. 2005) ("We note that *Payton* only addresses entry by officers into the residence of the subject of the warrant."). Because in this case, law enforcement did not enter the *suspect's* home—the *defendant's* home—the Payton requirement that the government show that the officers had probable cause to believe that the unit on North 13th Street was the *defendant's* residence does not apply.

Steagald held that before law enforcement may search the home of a third party where they believe a suspect to be located, they must obtain a search warrant. If they don't, the *third-party homeowner* may challenge the search on Fourth Amendment grounds. In this case, the City of Milwaukee was the third-party homeowner, but the city is not challenging the search. Because the party challenging the search—the defendant—is not the third-party homeowner, the defendant cannot avail himself of the holding in Steagald.

As Judge Joseph stated, the Jackson standard provides the applicable framework for analyzing the facts in this case, in which officers with a valid arrest warrant entered the home of a third party to arrest the subject of that valid arrest warrant. Dkt. No. 52 at 10-11. Under Jackson, the officers needed only an arrest warrant for the suspect and "some basis"—probable cause or

42

something less—for believing that the fugitive was present in the third party's home. Jackson, 576 F.3d at 468-69. Judge Joseph correctly articulated the applicable legal standard. The officers' entry into the unit was lawful if the officers had probable cause to believe that the defendant was inside.

2. *Application of the Law to the Facts of This Case*

The defendant first argues that the government failed to show that probable cause existed for officers to believe that the defendant was in the upper unit. Dkt. No. 51 at 4. The defendant maintains that no officers saw him in the unit or even in the area. Id. at 7. In his post-hearing brief in support of the motion to suppress, the defendant relied on Payton for the proposition that an arrest warrant only "carries with it the limited authority to enter a dwelling in which the suspect lives when there is a reason to believe the suspect is within." Dkt. No. 46 at 5 (quoting Payton, 445 U.S. at 603). It is undisputed that the defendant in this case was not in his own home when the officers entered to execute the arrest warrant, so as the court explained above, Payton's two-pronged "residence plus presence" test does not apply.

The defendant argues that an arrest warrant "does not authorize law enforcement to enter a 3d person's home to execute a search warrant," and cites Steagald. Dkt. No. 46 at 7 (citing Steagald, 451 U.S. at 213-14). But the court has explained that the Steagald Court addressed only "the narrow issue" of "whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of

43

exigent circumstances." Id. at 212. Steagald focused on the rights of the homeowner/resident, not on the rights of the subject of the arrest warrant. Id.

Here, the defendant—the subject named in the arrest warrant—has asserted a Fourth Amendment right based on the execution of the arrest warrant at the unit where he went when he needed a place to sleep, but that he has affirmatively asserted was not his residence. Those were the facts in Jackson—the subject of the arrest warrant was arrested in someone else's residence. As the court has recounted, the Jackson court concluded that in such circumstances, officers do not need a search warrant; they need a reason to believe the defendant is in the dwelling. Jackson, 576 F.3d at 468-69. In dicta, the Seventh Circuit said that it "might be inclined to adopt the view of the narrow majority of our sister circuits that 'reasonable belief' is synonymous with probable cause." Id. at 469. The court didn't reach the issue because the evidence was "more than enough to lead a prudent person to believe that Jackson was inside the apartment when he or she entered." Id.

Based on this language, Judge Joseph adopted the probable cause standard and found that officers had probable cause to believe that the defendant was present in the upper unit of 4108 North 13th Street at the time officers forced entry. Dkt. No. 50 at 8. The court agrees. The parties stipulated to the conversation between Officer Ayala and the anonymous caller on May 24, 2022. Dkt. No. 32 at ¶1. The caller said that the defendant was living in the area of North 13th Street and Fiebrantz, that his telephone number was 414-676-5813 and that he was wanted, armed and dangerous. Id. Ayala took steps

44

to confirm that the phone number was linked to the defendant and sought a state search warrant to locate the number. Id. at ¶2. On June 3, 2022, the state court authorized a warrant to identify and track 414-676-5813. Id. at ¶3.

Next, Officer Randazzo confirmed that the telephone associated with that number was frequently located in the area of North 13th Street and Fiebrantz. Dkt. No. 44 at 16, line 7 through 26, line 25. Ayala conducted a wanted check and confirmed that the defendant was wanted on several warrants. Dkt. No. 32 at ¶4. While the defendant makes much of the delay between the authorization of the warrant and the arrest, Randazzo used the cell site simulator to narrow the device to 4108 North 13th Street on June 22, 2022. Dkt. No. 44, at 43, lines 10-14; 44, lines 1-25; 45, lines 1-2. The defendant clarifies—and the court agrees—that Randazzo could not determine whether the signal was coming from the upper or lower unit. The undisputed testimony in the record, however, was that the phone was pinging at that location.

When officers arrived at 4108 North 13th Street, Officer Cline spoke with the resident of the lower unit to ensure that they were entering the correct unit. The resident confirmed that she and a "lady friend" lived in the lower unit and that her son—not the defendant—lived in the basement. Dkt. No. 41, Ex. 4 at 1:06-1:18. She also stated that she had heard others upstairs the night before. Id. Officers cleared the basement. Dkt. No. 32 at ¶7. They then proceeded upstairs to the upper unit. Id. ¶8. At that point, it was reasonable for the officers to conclude that the signal was coming from the upper unit, because the defendant was not a resident of the lower unit and there was no one in the

45

basement. There was nothing to suggest that the phone—and the defendant—would be located anywhere else in the house.

The body cam footage supports the finding. First, it shows that officers did not immediately breach the upper unit's door. The parties stipulated that at approximately 11:16 a.m., Cline knocked three times with no response. Id. at ¶8; Dkt. No. 41, Ex. 4 at 8:54-9:59. Cline and Officer Dewitt heard movement inside the residence on two occasions, dkt. no. 32 at ¶8, and Cline testified that he heard a sound like someone was racking a gun, dkt. no. 45 at 63, lines 21-23. When viewing the footage, one hears Cline repeatedly state that the Milwaukee Police Department was present, that they knew the defendant was in the unit and that they had a felony warrant. Dkt. No. 41, Ex. 4 at 10:16-41:34. Cline continuously asked the defendant to open the door and said that the defendant had a felony warrant for his arrest; a male voice eventually stated, "Dang, I'm coming out," although no one came out. Dkt. No. 32 at ¶8. Although the officers did not know the defendant's voice prior to the arrest, they knew that his phone was pinging from the location and that the duplex was in the vicinity of the location identified by the anonymous caller. The officers also knew that the individual inside the unit responded when they called the defendant's name. The officers knocked and announced their presence and, as Judge Joseph stated, demonstrated "tremendous patience in attempting to coax [the defendant] out of the residence," pleading almost forty minutes before forcing the door. Dkt. Nos. 32 at ¶8; 41, Ex. 4 at 10:16-41:34; 50 at 10.

46

The defendant makes much of the fact that the trap and trace records located the phone in the area of North 13th and Fiebrantz between April 18 and June 3, 2022 but that officers didn't arrest the defendant until June 22, 2022. But the anonymous caller placed the defendant in that area, the trap and trace records established that the defendant was in that area regularly through June 3, 2022 and Randazzo testified that he used the cell site simulator on June 22, 2022 and that it pinged to the address. Because the officers had a valid arrest warrant and there was probable cause to believe that the defendant would be located in the upper unit, the court will deny the motion to suppress to the extent that it challenges the officers' entry into the unit.

B.  Protective Sweep

Next, the defendant challenged the protective sweep incident to his arrest on the ground that he had a reasonable expectation of privacy in the upper unit as an "invited guest" and that the officers did not have a reasonable belief that others who might pose a danger to the officers were in the upper unit. Dkt. No. 51 at 8-9.

The inquiry into the reasonableness of the search "turns in large part on the extent of [the defendant's] legitimate expectations of privacy . . . ." United States v. White, 781 F.3d 858, 861 (7th Cir. 2015) (citation omitted). The Supreme Court has found that overnight guests have a legitimate expectation of privacy in their host's homes. Olson, 495 U.S. at 98. The Olson Court observed that we stay in others' homes when we travel, visit our parents or

47

relatives, when we are in between jobs or homes or when we house-sit for a friend. Id. It reasoned that finding a privacy interest under such circumstances "merely recognizes the everyday expectations of privacy that we all share." Id. On the other hand, the Seventh Circuit determined that a defendant who had been evicted two weeks prior to the search had no legitimate expectation of privacy in his home and therefore no Fourth Amendment search occurred. United States v. Curlin, 638 F.3d 562 (7th Cir. 2011). More recently, the Seventh Circuit declined to answer whether a fugitive hiding in a hotel room had a legitimate expectation of privacy as an overnight guest. U.S. v. Procknow, 784 F.3d 421, 426 (7th Cir. 2015).

On this record, the court cannot conclude that the defendant had a legitimate expectation of privacy. Officer Ayala's body cam captured the defendant repeatedly stating that he did *not* stay at the apartment. Dkt. No. 41, Ex. 5 at 0:49-1:12. He said that "this girl" let him in. Id. at 1:23. He mentioned that a friend of his let him stay but said he didn't know if the unit was in his friend's name. Id. at 1:25-1:31. The defendant said that he didn't stay there but he would "come through" when he needed a place to sleep. Id. at 1:33-1:46. He denied having any property in the unit. Id. at 1:51-1:56. On these facts, it is difficult to conclude that the defendant had a subjectively reasonable expectation of privacy in the upper unit, let alone one that society is willing to recognize as reasonable.

The court concedes that there is ambiguity surrounding this issue. The apartment was furnished and the record is not clear as to who let the

48

defendant into the unit. "Lee" told Ayala that he vacated the apartment in May of 2022 but the defendant never said that Lee was the person who allowed him to stay in the unit. But the question of whether the defendant had a legitimate expectation of privacy in the unit is not dispositive. Judge Joseph concluded that even if the defendant had had a reasonable expectation of privacy in the unit, he failed to demonstrate that the officers exceeded the permissible parameters of a protective sweep. Dkt. No. 50 at 13.

In Buie, the United States Supreme Court held that in limited circumstances, a "protective sweep" constituted an exception to the warrant requirement of the Fourth Amendment. Buie, 494 U.S. at 327. The police executed an arrest warrant in Buie's house because he and another individual were suspected of armed robbery. Id. at 328. They arrested Buie as he emerged from the basement. Id. One of the detectives entered the basement after the arrest "in case there was someone down there" and found a red running suit that matched the description of the clothing one of the robbery suspects had worn. Id. The Supreme Court upheld the admission of the suit as evidence at trial because it was seized during a reasonable protective sweep. Id. The Court explained that police officers had a legitimate interest "in taking steps to assure themselves" that the premises of the arrest was not harboring other dangerous individuals. Id. at 333.

Under Buie, "as an incident to the arrest" and "as a precautionary matter and without probable cause or reasonable suspicion," officers may "look in closets and other spaces immediately adjoining the place of arrest from which

an attack could be immediately launched." Id. at 334. Where "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger," the search may extend beyond the parameters of the first type of protective sweep. Id. Such a sweep must not last "longer than is necessary to dispel the reasonable suspicion of danger." Id. at 335–36. The inquiry as to the reasonableness and validity of a protective sweep is necessarily fact specific. United States v. Burrows, 48 F.3d 1011, 1016 (7th Cir. 1995).

Here, the officers entered the upstairs unit, where they believed the defendant would be located, to execute the search warrant. The resident downstairs had said that there were "different people up there" and that she had heard others in the apartment the night before. Dkt. No. 41, Ex. 2 at 0:43-1:23. The officers approached the upper unit at 11 a.m.; Officer Cline testified that he was concerned about the sounds of someone running around inside the unit and what he believed to be someone racking a slide. Dkt. Nos. 41, Ex. 2 at 1:45; 45 at 66, lines 6-11. Review of the body cam footage reveals that officers believed someone else could be in the unit. Cline warned that others inside the unit could be charged with harboring a fugitive and Cline called out to the defendant "and anyone else inside." Dkt. No. 41, Ex. 2 at 40:50-41:27. Cline asked the defendant whether others were in the unit but the response couldn't be heard on the body cam footage. The combination of what the officers learned from the downstairs tenant and heard while waiting for the defendant to come

50

out of the unit made their fear—that others were present and could pose a danger—reasonable. See U.S. v Henderson, 748 F.3d 788, 792 (7th Cir. 2014) (search lawful where the officers, after detaining an individual, "did not know how many occupants or what the occupants were doing inside the house during the standoff").

That does not end the inquiry. Buie limits the scope of a protective sweep to a "cursory" inspection of spaces where individuals may be found and a length no longer than is necessary to dispel potential danger; it does not allow a full search of the premises. 494 U.S. at 326. In determining whether the search was of a limited scope, courts should analyze "the configuration of the dwelling, the general surroundings, and the opportunities for ambush." U.S. v. Starnes, 741 F.3d 804, 808 (7th Cir. 2013). "An ambush in a confined setting of unknown configuration is just such a situation in which an officer might need to perform a protective sweep." Id. (citing Buie, 494 U.S. at 333; U.S. v. Tapia, 610 F.3d 505, 511 (7th Cir. 2010)).

The defendant argues that Judge Joseph should have included in the recommendation the fact that the closet door was closed and that it was located fifty to sixty feet from the door where he was arrested. Those facts do not alter the analysis. Officer Cline testified that the protective sweep was captured on his body cam and that the time it took to sweep the two bedrooms and the bathroom was "[a]pproximately three minutes." Dkt. No. 45 at 68, lines 14-25. The loaded drum magazine was in plain view on the floor of the closet. Id. at 69, lines 24-25; 70, lines 1-5. The body cam footage from Cline and

51

Officer Lastrilla shows the officers quickly moving through the rooms, looking under clothes and beds to see if someone was hiding. Dkt. No. 32, Exs. 2, 4 at 34:26-52:17.

The defendant also takes issue with the search of the attic, which consumed the bulk of the time spent on the sweep. Cline testified about how subjects have concealed themselves in unusual hiding spots and said that he has arrested subjects in "walk-in closets or just regular closets, in the attic, up in the rafters, hiding beneath—between the walls, inside of sofas, inside of bed mattresses, inside of dryers, washing machines" and "underneath clothing items, garbage bags." Dkt. No. 45 at 56 at lines 3-11; 70 at lines 9-24. The crawl space was accessible from the hallway where the defendant was standing before his arrest and where the officers heard movement. Dkt. No. 41, Ex. 4 at 37:45-37:57. The officers were concerned that someone could be in that space and used a broom to try to push up the entrance to the space, but that didn't work. Id. at 37:48-39:00. Once they pushed the attic space open, officers repeatedly yelled to anyone in there to come to the opening with their hands up. Id. at 39:00-4 The bathroom appeared to have a hole to the attic space. Id. at 43:08-43:13. Officers remained in the doorways below monitoring the space while they tried to figure out how to safely access the space to clear it. Id. at 39:00-52:17. The court agrees with Judge Joseph that the officers did not exceed the scope of the protective sweep.

C.    Application for the Search Warrant

The defendant objects that Judge Joseph wrongly concluded that the drum magazine was properly included in the application for the warrant. The Fourth Amendment requires search warrants to be supported by probable cause. U.S. CONST. AMEND. IV. "[A] neutral magistrate must decide [whether] probable cause [exists] before the police conduct a search." United States v. Taylor, 63 F.4th 637, 648 (7th Cir. 2023). The court upholds the determination so long as there is a substantial basis for concluding that a search would uncover evidence of wrongdoing. United States v. Yarber, 915 F.3d 1103, 1105 (7th Cir. 2019).

The defendant attached Officer Alaya's application and the warrant to his post-hearing brief. Dkt. No. 46 at 12-17. Ayala averred that the defendant had been linked to a shooting on April 13, 2022, that a check of CCAP revealed that the defendant previously had been convicted of a felony, that officers arrested him in the upper unit of 4108 N. 13th Street after knocking for thirty minutes and that the defendant stated he did not reside at the location. Id. at 14. Ayala averred that after arresting the defendant, Officer Cline "checked a bedroom closet and observed in plain view, a 'drum magazine' which contained unspent cartridges." Id. Ayala stated that officers remained at the location. Id.

The application established probable cause sufficient to allow the court commissioner to conclude that evidence of the crime of "Felon in Possession of a Firearm" could be found in the upper unit. Id. at 12. The court also agrees with Judge Joseph that the warrant is otherwise saved by the good faith

53

exception under <u>Leon</u>, 468 at 897. The defendant argues that Ayala was not acting in good faith when he averred that "officers checked the residence for any lurking confederates." Dkt. No. 46 at 14. The court has concluded that officers had a reasonable basis for concern that other people could be located in the unit. Ayala's statement was not recklessly false and the defendant has not rebutted the presumption that the officers acted in good faith when seeking the warrant.

## VI. Conclusion

The court **OVERRULES** the defendant's objections. Dkt. No. 51.

The court **ADOPTS** Judge Joseph's report and recommendation. Dkt. No. 50.

The court **DENIES** the defendant's motion to suppress. Dkt. No. 24.

The court **ORDERS** that by the end of the day on **March 29, 2024**, the parties must file a joint report, updating the court as to the status of the case and the parties' proposed next steps. The status report must notify the court whether the parties are asking the court to exclude time under the Speedy Trial Act, and if so, under what provision.

Dated in Milwaukee, Wisconsin this 6th day of March, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**